**Lucy T. LEE**

v.

**UNITED STATES of America.**

**Civ. No. 3–79–20.**

United States District Court, E. D. Tennessee, N. D.

Sept. 24, 1980.

Benton H. Jones, Knoxville, Tenn., for plaintiff.

Jeffrey Axelrad, U. S. Dept. of Justice, Washington, D. C., W. Russell Welsh, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, seeking damages for injuries resulting from a swine flu inoculation.[1] The Government has stipulated that it is liable for the damages suffered by plaintiff as a result of her contracting Guillain–Barre Syndrome (GBS). The sole issue before the Court is the amount of damages which plaintiff sustained.

### I.

Plaintiff received her swine flu inoculation on November 15, 1976. At that time she was 67 years old and both mentally and physically healthy. She frequently walked to stores and restaurants near her home. She sewed a great deal and made her own clothes. She was able to do jobs around her home, as for example raking leaves. She was not employed.

Within a month after receiving the vaccination, she began to experience difficulty in walking and developed a general weakness. Her knees buckled when she stood, and her feet became numb. She began to have pain in her back and legs which became increasingly worse. Immediately prior to her hospitalization, she fell and was unable to get up without help.

Plaintiff was hospitalized on December 15, 1976. At that time she could not walk at all and was in extreme pain. She also experienced difficulty in breathing. Plaintiff remembers suffering during her hospitalization, but otherwise remembers only "bits and pieces" of her stay. While hospitalized she could not feed herself and could not control her bodily functions. A catheter was necessary. She was treated by Dr. William Paulsen, a board–certified neurologist. Plaintiff was released on January 29, 1977 and went to stay with her daughter.

Plaintiff was treated by Eileen McMillan, a registered therapist, from February, 1977 until November, 1977. When this treatment began, plaintiff was confined to bed and was in severe pain. She was unable to move her legs and could only move her arms a minimal amount. By April, 1977, she was able to sit up on her bed without assistance. On April 11, 1977, she took six steps with the aid of a walker and by June, 1977 was able to use a wheelchair. In June, 1977, plaintiff moved to her own apartment. Ms. McMillan determined in November, 1977 that plaintiff was able to function in her apartment and terminated treatment at that time. At about this time, plaintiff ceased using her wheelchair, but remained quite weak. Plaintiff fell in her apartment in May, 1978 and broke her foot. The Government does not dispute the causal connection between plaintiff's GBS and her broken foot. Plaintiff continued to improve until mid–1978 when she reached her current condition.

The majority of the testimony at trial centered around whether or not plaintiff suffers from any residual deficit in her peripheral nervous system.

Doctor Wade Boswell, a board–certified neurologist, examined plaintiff on four occasions for the purpose of testifying in this litigation. Dr. Boswell examined plaintiff on April 4, 1978, January 21, 1979, March 5, 1979 and September 3, 1980. His 1978 clinical examination revealed that plaintiff had difficulty in walking on her toes and on her heels and generally had muscle weakness. Reflexes were absent at the ankle and plaintiff could not consistently detect the position of her toes and fingers with her eyes closed. The examination of March, 1979 showed some improvement. Plain-

---

1. The National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(k)(5)(A), provides that swine flu actions are deemed to be actions brought under the Federal Tort Claims Act.

tiff's condition was found to be essentially the same in September, 1980 as it was in the 1979 examinations. As a result of these examinations, Dr. Boswell determined that plaintiff has a "mild" permanent residual disability. He defined mild as meaning a 25% impairment. He emphasized the difficulty which plaintiff experiences in determining the position of her feet when walking.

Doctor Joe Sweet, an internal medicine specialist, examined plaintiff on January 23, 1980, in order to determine her condition for this litigation. He determined as a result of his neurological examination that plaintiff had difficulty standing on her heels and toes because of muscle weakness. Plaintiff was unable to walk in a straight line without assistance. He found an inequality of reflexes in plaintiff's upper extremities, normal reflexes at her knees and no reflexes at her ankles. He found that plaintiff's vibratory sense was impaired in her lower extremities and that she could not determine the position of her toes with her eyes closed. Her ability to sense a pin prick in her extremities ("stocking and glove motor weakness") was also noted. Because of plaintiff's stocking and glove motor weakness, inability to walk in a straight line without assistance and muscle weakness, Dr. Sweet fixed plaintiff's permanent disability at 50%. He stated that this was a subjective determination.

Doctor William Paulsen, who treated plaintiff while she was hospitalized, examined plaintiff on June 9, 1980 at the request of the Government. He gave plaintiff a complete neurological examination. He found that plaintiff could walk in a straight line without her cane and showed normal ability in other ambulatory tests. He found some stocking and glove impairment in the pin prick test but otherwise found her reflexes to have returned. He stated that 85% to 95% of GBS patients have a full functional recovery. He found that plain-tiff was within this fortunate group of patients who suffer no residual neurologic dysfunction.

Plaintiff testified that she is no longer the active person that she once was. She uses a cane for walking outside of her apartment and has difficulty doing things that she once thought were routine. She stated that her bout with GBS and resulting limitations on her activities often leave her depressed. She exercises daily to strengthen her muscles.

## II.

Plaintiff is entitled to recover those damages which proximately result from her illness. *City of Nashville v. Brown*, 25 Tenn.App. 340, 157 S.W.2d 612 (1942). This damage award includes her special damages, i. e., her medical bills, and intangible damages for plaintiff's pain and suffering and for any residual effects of GBS. Plaintiff's medical expenses are stipulated to be $12,500.00. There are no special damages for lost wages since plaintiff was not employed at the time of her illness.[2]

The primary component of the damage award in this case is the intangible element. It is difficult for the Court to place a dollar value on plaintiff's past pain and suffering and future impairment as a result of the residual effect of GBS.

In its brief, the Government states that five swine flu cases have been tried on damages only. They are: *Overton v. United States*, (W.D.Mo.1979), aff'd in part, rev'd in part, 619 F.2d 1299 (8th Cir. 1980); *Roberts v. United States*, Civ. Action No. 78–18–A (E.D.Va., May 15, 1980); *Sabonjian v. United States*, Civil Action No. 78–115 (D.N.J. June 26, 1980); *Draisma v. United States*, 492 F.Supp. 1317 (W.D.Mich., 1980); and *Marsden v. United States*, Civil Action No. 78–0599 (D.C.D.C. July 31, 1980).

---

**2.** Plaintiff argues in her brief that she is entitled to an award of damages for lost wages because she had accepted a job before she became ill. She had not assumed her responsibilities before her illness because her husband was recovering from surgery and needed her care. However, no proof was introduced as to the amount of wages which plaintiff hoped to earn. The Court will not speculate on plaintiff's possible lost wages.

Of these cases, the Court finds two to be helpful. The facts, as recited by the Government in its brief, are hereinafter set out.

In *Overton v. United States, supra,* the plaintiff was a 77 year old woman. She was hospitalized both in an acute care facility and in a rehabilitation hospital for over four months. Her medical special damages were $7,139.23 before the offset for Medicare. Mrs. Overton was, by reason of her disability resulting from the Guillain–Barre, confined to her apartment and was permanently disabled. The Court of Appeals found that the District Court's award of $106,500 in general damages was "generous" but not "monstrous, shocking, or plainly unjust." 619 F.2d at 1305.

In *Marsden v. United States, supra,* the plaintiff was a 43 year old woman with a 36 year life expectancy. She was hospitalized for two weeks with acute Guillain–Barre Syndrome. During this time, she had significant muscle weakness and numbness throughout her lower extremities as well as facial paralysis. The plaintiff underwent extensive physical therapy for six months after her discharge. She continued to experience the residual effects of her illness including fatigue, weakness and pain until the time of trial. She was totally disabled and incapable of returning to work until February of 1979 and experienced a 30% diminution of her earning capacity from then until the time of trial. She also had a 10% future diminution of her earning capacity for the remainder of her 20 year work life expectancy. Past and future wage loss totalled $41,000 and medical expenses totalled $11,250. Mrs. Marsden was awarded $100,000 for her past and future pain and suffering. Her future pain and suffering was based on the testimony of the defense and plaintiff's experts who placed her physical impairment at between 20% and 35% for the remainder of her 36 year life expectancy.

■ Plaintiff's damages are not as great as any of the plaintiffs in the foregoing cases. The damage awards in those cases are instructive. Considering all of the circumstances of her illness, the Court finds that an award of $80,000 would fairly compensate plaintiff for her illness and injuries.

### III.

The parties have stipulated that plaintiff received $11,885.88 in Medicare benefits from the time of inoculation until the present. Of this amount, $10,909.62 was received under Part A of the Medicare Program to cover plaintiff's hospital costs. 42 U.S.C. §§ 1395c–1395i. The remaining $976.26 was received under Part B of the Medicare Program for physicians' charges. 42 U.S.C. §§ 1395j–1395w. Plaintiff has collected from the Government her Medicare benefits and she is not entitled to a double recovery.

For the foregoing reasons, the Court is of the opinion that plaintiff is entitled to an award equal to $80,000.00. Accordingly, it is ORDERED that judgment enter in favor of plaintiff in the amount of $80,000.00.

Order Accordingly.